## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH MANGAN, as parent and
natural Guardian of A.M, a minor,

     Plaintiffs,

     v.

HANOVER TOWNSHIP SCHOOL
DISTRICT, et. al.,

     Defendant.

CIVIL ACTION NO. 3:22-CV-01578

(SAPORITO, J.)

## MEMORANDUM

On October 7, 2022, the plaintiff Joseph Mangan ("Mangan") and his daughter ("A.M.") commenced this action against the Hanover Township School District (the "School District") and individual defendants Katherine Healey ("Healey") and Russell Davis ("Davis") seeking compensation for injuries stemming from A.M. being hit by a softball during a softball practice on April 28, 2021. (Doc. 1). The plaintiffs have alleged claims under *Monell* liability and state-created danger liability against the defendants for their role leading up to, and on, April 28, 2021. The School District and defendants Davis and Healey have moved for summary judgment. (Doc. 55); (Doc. 57). The matter has been fully briefed by the parties (Docs. 55–64) and it is now ripe for

review.

## I.    Undisputed Statement of Material Facts[1]

This action revolves primarily around defendant Katherine Healey. Defendant Healey was hired by the School District as a secondary health and physical education teacher on August 17, 2005, and her professional tenure was officially approved by the School District on September 12, 2008. Defendant Healey was later appointed as the head softball coach for the School District on February 16, 2016. However, throughout her tenure as a teacher and athletic coach, the complaint alleges that defendant Healey faced multiple allegations of misconduct.

- Between the years of 2012 and 2014, defendant Healey was

---

[1] The plaintiffs have filed their own "Statement of Undisputed Material Facts" in support of their opposition briefs. (Doc. 59; Doc. 60). This statement of facts by the plaintiffs, however, does not respond to the numbered paragraphs set forth in the statement filed by the defendants. Under Local Rule 56.1, a party opposing summary judgment must file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs" in the movant's statement of material facts. M.D. Pa. L.R. 56.1. The local rule does not permit a non-moving party to file an *additional* statement of material facts that does not respond to the movant's statement. However, Rule 56(c)(3) of the Federal Rules of Civil Procedure allows us to consider the plaintiffs' "Statement of Undisputed Material Facts" for purposes of the current motion before the court. *See* Fed. R. Civ. Pro. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). We will do so here.

alleged to have bullied a student with ADHD and Aspergers Syndrome for his failure to comply with defendant Healey's locker room rules for swimming class. (Doc. 60, ¶¶ 17, 20). The student's family opted to pursue legal action against the School District for defendant Healey's actions, ultimately resulting in a settlement agreement between the School District and the family. (*Id.*, ¶ 26).

- During the years 2014 through 2018, defendant Healey allegedly subjected a student to repeated harassment and bullying measures by purposely targeting the student's anxiety. (*Id.*, ¶¶ 29, 30). The student's family exchanged multiple emails and sent numerous letters to school officials and board members about defendant Healey's allegedly abusive behavior. (*Id.*, ¶¶ 32, 33).

- Between the years 2016 through 2018, a varsity basketball member coached by defendant Healey alleged that she was subjected to repeated mental, emotional, and verbal abuse at the hands of defendant Healey. (*Id.*, ¶¶ 34, 35). The basketball member stated that players were publicly singled out for losses and driven to tears. (*Id.*, ¶¶ 36, 38). The student's mother

attended a School Board meeting to express concerns about defendant Healey, and shortly thereafter, the student decided to transfer to a different school "for the sole purpose of getting away from Defendant Healey." (*Id.*, ¶¶ 40, 41).

- During the 2020–2021 school year, a student in defendant Healey's virtual physical education class accused defendant Healey of repeatedly making sarcastic comments about her fluctuating weight, which was caused from the student's type 1 diabetes and thyroid disease. (*Id.*, ¶¶ 46, 48).

These allegations of conduct also include the varsity girls' softball team specifically at the School District. On May 3, 2019, one of the softball assistant coaches requested a meeting with the defendant Davis and the principal at Hanover Area High School to discuss various complaints from coaches and players regarding the alleged abusive treatment they have been subjected to by defendant Healey. (*Id.*, ¶ 50). Moreover, on June 4, 2019, the parents of several softball players appeared at a Hanover Area School Board meeting to express concerns about defendant Healey's behavior toward their children. (*Id.*, ¶ 52).

On April 28, 2021, defendant Healey, along with assistant coach

Gary Williams, was coaching the School District's varsity girls' softball team during a routine practice. (Doc. 55-3, ¶ 62); (Doc. 57-5, ¶ 15). A.M. was a member of the softball team at that time. (Doc. 57-5, ¶ 13). Defendant Davis, the athletic director of the School District from 2004 to June 2020, was not present at the practice as he had left his employment from that position at the time of the practice. (Doc. 55-3, ¶¶ 54, 83); (Doc. 57-5, ¶ 17).

At some point during the softball practice, defendant Healey asked A.M. to participate in a drill called "soft toss." (Doc. 55-3, ¶ 86). The drill involves a pitcher lobbing a ball to a batter while standing behind a pitching screen placed between the pitcher's mound and home plate, and it is commonly used at different levels of softball. (Doc. 55-3, ¶ 86). The main purpose of soft toss is to improve hitting skills by allowing batters to take as many swings as possible to develop their hitting skills. (Doc. 55-3, ¶ 91). Specifically, as the defendants note, soft toss helps players focus on their swing mechanics, hand-to-eye coordination, and timing by mimicking the conditions of the game. (Doc. 55-3, ¶ 92). Defendant Healey had used the drill with prior softball teams for years, including A.M.'s softball team, without any prior incidents. (Doc. 55-3, ¶¶ 88, 89);

(Doc. 57-5, ¶ 111). Throughout that time, no one had ever expressed any views that soft toss was so dangerous that it should not be used. (Doc. 57-5, ¶ 94).

During the practice on April 28, 2021, A.M. was pitching behind a pitching screen approximately fifteen to twenty feet away from home plate. (Doc. 55-3, ¶ 102). The pitching screen had no openings or holes. (Doc. 55-3, ¶ 100); (Doc. 57-5, ¶ 40). However, due to the windy conditions on the day of the practice, tarps were placed on the feet of the screen to prevent it from blowing with the wind. (Doc. 55-3, ¶¶ 109, 110); (Doc. 57-5, ¶ 22). The tarps had never been used at any softball practice prior to April 28, 2021, as they had been delivered earlier that day. (Doc. 55-3, ¶ 112). At some point during the soft toss drill, A.M. was hit in the back of the neck/head with a batted ball. (Doc. 55-3, ¶ 126). She was not behind the pitching screen when she was hit in the back of the neck even though she was instructed to stay behind the pitching screen when pitching soft toss. (Doc. 55-3, ¶¶ 107, 122). After tossing the pitch that led to her injury, A.M. had decided to turn around and pick up a ball from the ground instead of ducking behind the pitching screen as instructed by the coaches. (Doc. 55-3, ¶ 125). There is no evidence that anyone told A.M. to

turn around after tossing pitches to the batters. (Doc. 55-3, ¶ 130). After being notified of A.M.'s injury, plaintiff Mangan picked up his daughter and transported her to the emergency room where A.M. was treated for her injuries. (Doc. 57-5, ¶¶ 49, 50). The plaintiffs contend that both the physical conditions present during the softball practice on April 28, 2021, and defendant Healey's alleged background of mental abuse contributed to foreseeable harms leading to A.M.'s injury, and thus bring *Monell* and state-created danger claims against the defendants.

## II.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure dictates summary judgment should only be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

Parties seeking summary judgment bear "the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52. A court must first determine if the moving party has made *prima facie* showing that it is entitled to summary judgment when evaluating such a motion. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other

materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 595, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III.  Discussion

The plaintiffs have alleged claims under *Monell* liability and state-created danger liability against the defendants for their role and actions leading up to, and on, April 28, 2021. Both *Monell* and state-created danger claims are subject to liability under 42 U.S.C. § 1983.

### A.  Actions under Section 1983

Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other

> person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress....

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but

instead provides remedies for rights established elsewhere. *City of*

*Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983

claim, a plaintiff must show that the defendants, acting under color of

state law, deprived the plaintiff of a right secured by the United States

Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.

1995). Specifically, the plaintiffs have alleged two theories of liability

under § 1983: (1) state-created danger liability; and (2) *Monell* liability.

We shall outline each theory below.

## I.    State-Created Danger Theory

As noted above, the plaintiffs assert Fourteenth Amendment state-

created danger claims against all defendants under 42 U.S.C. § 1983. The

Third Circuit has succinctly classified the theory of state-created danger

as follows:

> The government has no general legal duty to keep
> people safe. But it assumes one when it affirmatively
> places [a] person in a position of danger [that] the person
> would not otherwise have faced. Then, the government

> must protect people from the dangers it created. The
> Fourteenth Amendment's Due Process Clause requires
> it to do so.

*Mears v. Connolly*, 24 F.4th 880, 883 (3d Cir. 2022) (internal quotations

marks and citations omitted). Therefore, under this theory of liability, a

plaintiff must prove:

> (1) the harm ultimately caused was foreseeable and
> fairly direct;
>
> (2) a state actor acted with a degree of culpability that
> shocks the conscience;
>
> (3) a relationship between the state and the plaintiff
> existed such that the plaintiff was a foreseeable victim
> of the defendant's acts, or a member of a discrete class
> of persons subjected to the potential harm brought about
> by the state's actions, as opposed to a member of the
> public in general; and
>
> (4) a state actor affirmatively used his or her authority
> in a way that created a danger to the citizen or that
> rendered the citizen more vulnerable to danger than had
> the state not acted at all.

*Bright v. Westmoreland*, 443 F.3d 276, 281 (3d Cir. 2006). However, the

Third Circuit has cautioned against expansion of the state-created

danger doctrine based on Supreme Court precedent. *O'Donnell v.

Scranton School District*, 615 F. Supp. 3d 262, 276 (M.D. Pa. 2022). In

*Henry v. City of Erie*, 728 F.3d 275 (3d Cir. 2013), the court held:

The Supreme Court has counseled a restrained approach in the area of substantive due process. The Court has said that "guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended," and cautioned that courts must "exercise the utmost care whenever ... asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Heeding this advice, the *Deshaney* Court declined to expand its substantive due process jurisprudence even in the face of tragic circumstances, explaining that[:]

> [t]he people ... may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one. They may create such a system, if they do not have it already, by changing the tort law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment.

489 U.S. at 203. Again, in *County of Sacramento v. Lewis*, the Court said that substantive due process "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," 523 U.S. 833, 848 (1998), and found that in cases dealing with executive action, our role is to guard against "only the most egregious official conduct." *Id.* at 488.

728 F.3d at 286. We must therefore approach a state-created danger claim with caution in light of this analysis.

## II.    *Monell* Liability

The plaintiffs assert a *Monell* liability claim against the School District. In *Monell v. Department of Social Services,* 436 U.S. 658 (1978),

the Supreme Court of the United States established that municipalities and other local governmental units are included among those "persons" subject to liability under § 1983. *Id.* at 690. The School District is such a municipality subject to liability as a "person" under § 1983. *See id.* at 694; *Baker v. Benton Area Sch. Dist.*, 418 F. Supp. 3d 17, 54 (M.D. Pa. 2019).

But "[u]nder *Monell*, a municipality cannot be subjected to liability solely because injuries were inflicted by its agents or employees." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 249 (3d Cir. 2007). Rather, a municipality can only be liable under § 1983 if the alleged unconstitutional conduct either "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690–91. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Jiminez*, 503 F.3d at 249. "A plaintiff must identify the challenged policy,

attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984).

Courts have held that municipalities can be liable under section 1983 for the civil rights violations of its employees for official policy in the following three situations:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

*McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (some internal citations omitted).

Alternatively, "[a] municipality may be held liable under § 1983 for failure to train, monitor, or supervise, [but] only where the plaintiff can 'identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific

training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred.'" *Watson v. Philadelphia Hous. Auth.*, 629 F. Supp. 2d 481, 487 (E.D. Pa. 2009) (quoting *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005)); *see also Nawuoh v. Venice Ashby Cmty. Ctr.*, 802 F. Supp. 2d 633, 645 (E.D. Pa. 2011) ("While municipal liability under § 1983 originally hinged on affirmative policies, or customs, modern jurisprudence has extended it to a [municipality]'s failure to train, supervise and discipline its officers.").

A three-part test applies to determine if a municipality's failure-to-train amounts to "deliberate indifference" for purposes of a *Monell* claim: "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Kocher v. Larksville Borough*, 926 F. Supp. 2d 579, 605 (M.D. Pa. 2013) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). The plaintiffs have brought their *Monell* claim under this failure-to-train theory. We now turn to the claims against the School District and the individual defendants.

### B.    The School District

The plaintiffs have asserted state-created danger and *Monell* failure-to-train claims against the School District.[2] We shall analyze them each individually.

### 1.    State-Created Danger Theory

The plaintiffs' state-created danger claims for A.M.'s injury are based on two of the School District's acts that allegedly put A.M. in danger for her injury: (1) the use of faulty pitching equipment; and (2) the hiring of defendant Healey.

We first turn to the plaintiffs' allegations concerning the School District's use of faulty pitching equipment for softball. Under a state-created danger theory, a plaintiff must first offer evidence that the injury was caused by a foreseeable and direct harm. *See Bright*, 443 F.3d at 281 (finding the first factor in a state-created danger test to be whether "[t]he harm ultimately caused was foreseeable and fairly direct"). The plaintiffs

_____

[2] The plaintiffs potentially allude to an additional § 1983 claim under an inadequate hiring theory of liability against the School District. (Doc. 56, at 20). The plaintiffs, however, fail to directly assert this claim in their complaint. *See* (Doc. 1). Therefore, we find that the plaintiffs only assert a failure-to-train claim under *Monell* liability.

have gone to great lengths to illustrate the danger posed by the allegedly faulty equipment to the Varsity Girls softball team, specifically the pitching machine and the pitching screen. *See* (Doc. 1, ¶ 32) ("The pitching screen that was provided was in deplorable condition and required the use of heavy tarps to weigh down the base in an apparent effort to prevent the screen from blowing over due to wind"); (Doc. 1, ¶ 41d) ("[T]he use of this unsafe pitching screen posed a substantial risk of harm to Minor Plaintiff and other players"); (Doc. 59, ¶¶ 54–65) (listing numerous instances of safety issues relating to the use of a defective pitching machine); (Doc. 59, at 30) ("Beginning in April 2016, coaches and players continuously expressed concern regarding Healey's use of a defective pitching machine that posed a significant safety risk to players."). But, the plaintiffs have failed to articulate exactly how the pitching machine or the pitching screen were involved in A.M.'s injury. Nor have the plaintiffs presented evidence that the pitching machine or the pitching screen caused A.M.'s injuries. Indeed, when looking at the record, the events leading to the injury were wholly independent from the faulty equipment, and as such, the plaintiffs cannot sustain a state-created danger claim on this premise.

The pitching machine, for example, is not mentioned anywhere in the plaintiffs' complaint, statement of facts, or opposition briefs concerning the events of the incident on April 28, 2021. A.M. was neither hit directly by an erratic pitch from the machine nor hit by a ball that was pitched by the machine. Moreover, she did not run into the pitching machine causing injury. In fact, there is no evidence that any individual was using, or had used, the pitching machine on April 28, 2021. (Doc. 57-5, ¶ 14) (noting A.M.'s testimony that "[n]one of the school districts' pitching machines were used at the practice held on April 28, 2021."). We therefore cannot see how A.M.'s injury may have been foreseeable and direct due in part to the faulty pitching machine when there is no evidence that it was used on the day of A.M.'s injury or on the premises on the date of the incident.

The plaintiffs have similarly failed to articulate the pitching screen's direct role in the accident and they have not directed us to evidence concerning it. It is undisputed that the pitching screen, unlike the pitching machine, was used during the softball practice on April 28, 2021, as A.M. stood behind the screen while pitching during soft toss. (Doc. 57-5, ¶ 21). But the plaintiffs have similarly failed to introduce

evidence that the pitching screen somehow caused A.M.'s injuries, and for purposes of a state-created danger claim, it is not enough that the pitching screen was merely used during the events leading to injury, but rather, the plaintiffs bear the burden to show that the pitching screen contributed to a foreseeable and direct harm in correlation to A.M.'s injury. Here, although the plaintiffs allege two "foreseeable and direct" harms stemming from the pitching screen that they argue contributed to A.M.'s injuries, both allegations fail to meet the necessary burden.

The plaintiffs first allege in their complaint that the pitching screen's overall "*deplorable condition* ... posed a substantial risk of harm." (Doc. 1, ¶¶ 41(c),(d)) (emphasis added). But there is no evidence in the record of any defects in the screen. A.M. testified that she "does not recall the protective screening having any holes." (Doc. 57-5, ¶ 40). Without any evidence of this contention, we must therefore assume that nothing about the pitching screen's physical condition could be seen to "pose[] a substantial risk of harm."

The plaintiffs next contend that the use of "two large, rolled up tarps on the base of the [pitching] screen to prevent the wind from knocking it over" contributed to a foreseeable and direct harm to A.M.'s

injury. (Doc. 59, ¶ 69). The plaintiffs argue that "the placement of the aforementioned tarps made it more challenging for the pitcher to get to the protected area behind the screen after throwing a pitch." (*Id.*, ¶ 70); (Doc. 57-5, ¶ 26) ("A.M. explained that she believed the protective screen was the cause of her accident as it got in the way of her pitching."). However, this argument is unpersuasive.

We can find no evidence, nor have the plaintiffs directed us to any, that links a direct harm stemming from the use of the tarps to A.M.'s injury. There is no evidence that the plaintiff somehow tripped over the tarps while attempting to evade the softball, or even that the plaintiff came into contact with the tarps. *See* (Doc. 55-3, ¶ 171) ("There is no evidence that anyone was ever subjected to injury from a pitching screen."). The evidence shows, however, that A.M. turned her back to the batter outside of the protection of the pitching screen rather than attempting to move behind it. (Doc. 57-5, ¶ 28) ("A.M. conceded that she turned her back to the pitch balls on several occasions and recalled that another player [] had told her not to duck but to run back to where the net was."); (Doc. 57-5, ¶ 42) ("A.M. conceded that she could have avoided being hit if she had remained facing the batter."); (Doc. 57-5, ¶ 43) ("A.M.

conceded that she could have jumped down to the ground and got out of the way of the ball, but she didn't see the ball coming toward her because she had her back turned."). The record therefore indicates that the tarps' only role during the events on April 28, 2021, was merely weighing down the pitching screen; it did not contribute to a foreseeable and direct harm concerning A.M.'s injuries.

Nonetheless, even if we accepted the contention that the tarps were somehow involved and constituted a direct harm, there is no evidence in the record that supports the plaintiffs' argument that A.M.'s injury was foreseeable due to the tarps' placement or use, as necessary under the first element for a claim under the state-created danger theory. The Third Circuit has held that foreseeability "require[s] the plaintiff to 'allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm.'" *Lesher v. Zimmerman*, 822 F. App'x 116, 119 (3d Cir. 2020) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008)). Put differently, there must be some evidence that the School District had some knowledge or awareness of a harm stemming from the tarps prior to the injury that put it on notice to be held liable.

The record is devoid of that evidence.

First, there is no evidence that the School District had actual knowledge that tarps were being used to weigh down the pitching screen, and no evidence exists of any prior use of the tarps to potentially put the School District on constructive notice. The record indicates that the tarps had never been used prior to April 28, 2021, and both defendant Healey and A.M.'s father testified that they understood the tarps to have only been delivered earlier that day. (Doc. 55-3, ¶ 112); (Doc. 57-5, ¶ 198) (recalling that "April 28, 2021 was the first time the tarps had ever been used and no one had expressed concern at the time"); (Doc. 57-5, ¶ 11) ("[A.M.'s father] acknowledged that he also understood that April 28, 2021 was the first time ever tarps have ever been used at a practice."). Moreover, there is no evidence that any party voiced any concerns about the challenges posed by the tarps' usage that could have put the School District on notice about an injury. (Doc. 57-5, ¶¶ 146, 147) ("[The Assistant Coach] relates that he did not hear any of the girls complaining that the tarps made it more challenging for a pitcher to step to the side of the screen when pitching" and "does not remember A.M. or anyone stating that the tarps made it more difficult to pitch."); (Doc. 57-5, ¶ 194)

("[The batter] cannot recall anyone voicing concerns about the tarp after its placement and if anyone objected to it."); (Doc. 57-5, ¶ 214) ("[The outfielder] concedes that no-one expressed concern about the placement of the tarps or objected to the use of the tarps, including the batter."). Therefore, without any evidence that the School District had notice about a risk of harm stemming from the use of tarps to weigh down the pitching screen, the plaintiffs cannot sustain a state-created danger claim on this theory.

Moreover, to the extent that the plaintiffs may argue that the soft toss drill itself constituted a foreseeable and direct harm to A.M.'s injuries, we find that argument unpersuasive. This type of claim must involve prior incidents in which the harm had, or could have, occurred under similar situations to put the state actor on notice of that harm. *See Lesher*, 822 F. App'x at 120, 121 (finding no foreseeability for a state-created danger claim when plaintiff failed to allege "any prior incidents in which coaches or players were injured while pitching" or "any other instances of injury caused by [the defendant] while batting, nor any prior incidents with similar circumstances."). Here, the record is devoid of any prior softball incidents involving soft toss similar to the one sustained by

A.M. to have put the School District on notice sufficient to support a state-created danger claim.

The record shows that the students at the School District engaged in soft toss for several years without any incident (Doc. 55-3, ¶ 89), and that the drill had been utilized numerous times by A.M.'s softball team prior to the practice occurring on April 28, 2021. (*Id.*, ¶ 88); *see also* (Doc. 57-5, ¶ 92) ("Healey had the softball teams engage in soft toss drills since 2016. Over the years, she had the students engage in the drill dozens of times, if not hundreds of times."). Moreover, defendant Healey testified, and the plaintiffs have not disputed, that the drill was so common that the students "typically set up the protective screen" and "knew what to do." (*Id.*, ¶ 101). Nonetheless, despite the prevalence of the drill, there is no evidence of a previous injury from soft toss. Indeed, the defendants assert, and the plaintiffs do not dispute, that "[n]o player, including A.M. and the prior pitcher, had been injured, hit or even nearly hit by a batted ball as they conducted the drill as instructed." (Doc. 57-5, ¶ 111); *see also* (Doc. 57-5, ¶ 48) ("A.M. is unaware of any student prior to her ever being injured from slow pitching too close to the plate."). In other words, the plaintiffs have not pointed to any prior incidents under similar situations

that put the School District on notice of a particular harm stemming from the drill, as required for a state-created danger claim. Therefore, because there is no evidence that A.M.'s injury was foreseeable due to general use of the soft toss drill, we find that the plaintiffs have failed to satisfy the necessary elements for a state-created danger claim concerning the School District's use of soft toss.

However, the plaintiffs additionally contend that, independent of the conditions present in the softball drill on April 28, 2021, A.M.'s injury was foreseeable and fairly direct in part to the School District's "hiring and retaining Defendant Healey as the girls' softball team coach and failing to take any action to address her dangerous behavior which exposed players to unnecessary risk of injury." (Doc. 59, at 31). In essence, the plaintiffs argue that it was not the softball practice conditions that posed a foreseeable risk to A.M.'s injury, but rather defendant Healey herself that was a foreseeable and direct harm, and that the School District should be held liable for hiring and retaining her on its staff.

The plaintiffs have made numerous allegations of prior misconduct involving defendant Healey that they categorize as "gross misconduct … harassment and bullying" (Doc. 59, ¶ 44), in support of their contention

that defendant Healey was a foreseeable and direct harm. *See* (Doc. 60, ¶¶ 17–53). But even so, we note that the injury in the underlying action concerns a physical injury, i.e., being hit in the back of the head with a softball, and the determination before the court under a state-created danger theory is not whether an injury occurred generally under defendant Healey's supervision, but rather whether A.M.'s specific softball injury was foreseeable and fairly direct in light of defendant Healey's background. Put differently, the plaintiff must produce enough evidence to support the allegation that defendant Healey's background of alleged mental abuse was sufficient to put the School District on notice that a student being hit by a softball while pitching during soft toss was foreseeable. We find that the plaintiffs have failed to do so here for several reasons.

First, the Third Circuit has rejected the notion that prior incidents involving complaints unrelated or otherwise dissimilar to the incident in question cannot serve as awareness on the part of state actors that is sufficiently concrete to put the actors on notice of harm for foreseeability in a state-created danger claim. *See Lesher*, 822 F. App'x at 121. Regarding defendant Healey, the plaintiffs rely on allegations which are

unrelated and dissimilar to the events on April 28, 2021. Rather, they involve allegations of mental abuse separate from the physical injury alleged in this action, and many of those allegations concern different sports altogether. *See, e.g.,* (Doc. 60, ¶¶ (34, 35) (highlighting allegations of mental abuse by defendant Healey against a student on the basketball team). Second, we are guided by the Third Circuit's admonition against the expansion of the state-created danger doctrine. *See Henry*, 728 F.3d at 286 (citing *Collins*, 503 U.S. at 125) ("[C]ourts must 'exercise the utmost care whenever … asked to break new grounds in this field.'"). We cannot identify any support in the record for a claim that a history of alleged infliction of mental abuse can sufficiently put a party on notice for a foreseeable harm regarding a purely physical injury which is an ordinary risk of the event under a state-created danger theory. Moreover, we believe that the connection between A.M.'s sustained injury and the alleged foreseeable harm caused by the hiring of the defendant is "too attenuated" to justifiably hold the School District liable for a state-created danger claim. *D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 623 (M.D. Pa. 2009) ("This inquiry essentially asks whether the alleged misconduct and the harm caused were 'too attenuated' to justifiably hold

the defendant liable.") (citations omitted). A.M.'s injury must be sufficiently connected to the harm that puts the state actor on notice, and as we have noted above, A.M.'s injury does not arise out of defendant Healey's alleged verbal abuse; it is an entirely different injury altogether. For these reasons, we will grant the School District's motion for summary judgment on claims concerning a state-created danger theory.

However, while the plaintiffs' allegations fail to satisfy the first prong of a state-created danger claim, we must note that the plaintiffs have additionally failed to produce evidence that the School District's conduct "shock[ed] the conscience" under the second prong of a state-related danger claim. Concerning the conscience shocking standard, the Third Circuit has described:

> In *Lewis*, the Supreme Court explained that "the core of the concept" of due process is "protection against arbitrary action," *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), and that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense[.]" *Id.* at 846, 118 S.Ct. 1708 (quotation omitted). The Court further explained, "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 847, 118 S.Ct. 1708 (quotation omitted). Accordingly, in a substantive due process challenge to an action taken by an executive branch official, "the question is whether

> the behavior of the government officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8, 118 S.Ct. 1708; *see also United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 399–400 (3d Cir. 2003) ("[O]ur cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience.").

*Kaucher v. County of Bucks*, 455 F.3d 418, 425 (3d Cir. 2006). The appropriate standard to determine whether a state actor's conduct meets the conscience-shocking requirement is "deliberate indifference." *O'Donnell v. Scranton Sch. Dist.*, No. 3:20-CV-225, 2024 WL 1197517, at *17 (M.D. Pa. Mar. 20, 2024) (quoting *Kauchner*, 455 F.3d at 426). The Third Circuit has held:

> At one end of the spectrum of culpable conduct, negligent behavior can never rise to the level of conscience shocking... At the other end of the spectrum, actions "intended to injure in some way unjustifiable by any government interest" are those "most likely to rise to the conscience-shocking level." Acts that fall between the extremes of mere negligence and harmful intent require courts to make "closer calls," based on a context-specific inquiry.

*Kaucher*, 455 F.3d at 426 (quoting *Lewis*, 523 U.S. at 849) (internal citations omitted). This present action, however, does not concern one of those "close calls," as there is no evidence in the record that supports conscience-shocking behavior amounting to deliberate indifference.

While we acknowledge that this case deals with an unfortunate incident, we must reconcile this injury with the "typical risks associated with playing softball" and the "type that can be reasonably contemplated when participating in sporting activities." *Lesher*, 822 F. App'x at 120; *see also Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 258 (3d Cir. 2010) ("Life is fraught with risk of serious harm and the sports world is no exception."). Indeed, in an analogous case, the Third Circuit previously found that a player being struck in the face by a softball during softball practice constitutes an injury and risk associated with playing the sport, and as such, the mere fact that the injury occurred "cannot be so deliberately indifferent as to shock the conscience[.]" *Lesher*, 822 F. Appx at 116, 120. Pertinent to this action, the Third Circuit made that determination concerning a plaintiff "who was not standing behind a pitcher's screen or wearing a mouth guard." *Id.* at 118. Therefore, in light of the Third Circuit's holding in *Lesher*, we find that the plaintiffs have failed to produce evidence of conscience-shocking behavior under the second prong of a state-created danger claim.

In this action, A.M.'s injury of being struck by a softball, much like the injury in *Lesher*, is one that "that can be reasonably contemplated

when participating in sporting activities" and cannot provide as the sole basis of a state-created danger claim, *Id.* at 120, and there is no evidence in the record that supports conscience-shocking behavior concerning the injury that amounts to deliberate indifference. A.M. was injured during a popular and widely-used softball drill in which she, and her team, were familiar. (Doc. 55-3, ¶ 88); (Doc. 57-5, ¶ 92). Moreover, she pitched behind a pitching screen without any defects (Doc. 57-5, ¶ 40) and wore a helmet for added protection. (Doc. 57-5, ¶ 40). We are therefore unable to identify any conscience-shocking behavior in the record amounting to deliberate indifference separate from those "typical risks associated with playing softball." Thus, the plaintiffs' state-created danger claims against the School District additionally fail under the second prong of a state-created danger analysis.

### 2.    *Monell* Liability

The plaintiffs bring a *Monell* failure-to-train claim under 42 U.S.C. § 1983 against the School District. As we noted above, when a policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those

employees will come into contact." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton, Ohio v. Harris*, 289 U.S. 378, 388 (1989)). Moreover, "'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Canton*, 489 U.S. at 391).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Thomas*, 749 F.3d at 223 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)). "Ordinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* (quoting *Connick*, 563 U.S. at 62). "A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and '[t]heir

continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability.'" *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 407).

The plaintiffs' allegations against the School District under *Monell* liability somewhat mirrors its allegations in its state-created danger claims. The plaintiffs allege that the School District was deliberately indifferent when it permitted defendant Healey "to continue coaching Varsity Girls Softball despite multiple credible reports of mistreatment and bullying of players, including several reports of continued use of defective equipment that exposed players to unnecessary risk of injury." (Doc. 1, ¶ 46). These allegations concern the same faulty pitching equipment and prior reports of mental abuse as the state-created danger claims. However, because the plaintiffs' allegations under their *Monell* claim parallel those alleged in their state-created danger claims, those allegations face the same flaws.

We must only look at the foundation of a *Monell* failure-to-train claim: an "identified deficiency in a city's training program must be

closely related to the ultimate injury." *Thomas*, 749 F.3d at 222. The plaintiffs' allegations, however, fail this basic element. As we have noted above concerning the defective equipment, it is undisputed that the pitching machine played no part in the injury in this action. Furthermore, there is no evidence that the pitching screen was defective, and even so, the plaintiffs have failed to present any evidence how it contributed to the injury. Therefore, it cannot be said that these deficiencies, if they can even be categorized as such, played a direct role in A.M.'s injury. Moreover, we have found the "multiple credible reports of mistreatment and bullying of players" that the plaintiffs rely on in this action constitute a harm that is wholly independent from A.M.'s injury. A.M. was not injured because of verbal abuse; she was injured during a soft toss drill at softball practice. We reiterate that the connection between A.M.'s sustained physical injuries and the alleged harm caused by defendant Healey's hiring is "too attenuated" to justifiably hold the School District liable. Therefore, because the plaintiffs have not produced any evidence of a pattern of constitutional violations that would have put the School District on notice of a potential injury similar to A.M.'s in this action, we will grant the School District's motion for summary judgment

on the plaintiffs' *Monell* claim. We turn next to the claims against the individual defendants, Healey and Davis.

## C.    Defendants Healey and Davis

The plaintiffs bring state-created danger claims against defendants Healey and Davis. Specifically, the plaintiffs allege claims arising out of defendant Healey's alleged "well-document[ed] history of mistreating and bullying her players, including forcing her players to participate in practice drills that exposed them to unnecessary risk of injury such as the dangerous batting practice drill that took place on April 28, 2021" (Doc. 60, at 29), and defendant Davis's "failure to take adequate steps to screen Defendant Healey's qualifications before hiring her as Head Girls Softball Coach, and his failure to supervise Defendant Healey in this role despite numerous incidents of bullying, abuse, and misconduct." (*Id.*). The defendants assert that they are entitled to qualified immunity, arguing that the plaintiffs' claims fail to establish a "clearly established" act of misconduct. *See* (Doc. 58). Moreover, the defendants contend that even in the absence of qualified immunity, the plaintiffs have still failed establish the elements of a state-created danger claim against defendants Davis and Healey. (*Id.*). Upon review of the record, we find the individual

defendants are entitled to qualified immunity, and therefore, we do not need to analyze the defendants' argument concerning the plaintiffs' failure to establish state-created danger claims.

The defendants argue that as state actors, they are entitled to qualified immunity under Section 1983 for the plaintiffs' claims. The doctrine of qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal rights has been violated; and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the

two *Saucier* prongs should be addressed first). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "In determining whether a right has been clearly established, the court must define the right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012). "When reviewing a qualified immunity defense, courts should examine their own and other relevant precedents." *Williams v. Bitner*, 285 F. Supp. 2d 593, 604 n.15 (M.D. Pa. 2003) (citing *Elder v. Holloway*, 510 U.S. 510, 516 (1994)). "It is the defendants' burden to establish that they are entitled to such immunity." *Beers v. Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (citing *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989)).

The plaintiffs argue that neither defendant Davis nor defendant Healey are entitled to qualified immunity because their conduct "violated Plaintiff's clearly established constitutional right to bodily integrity." (Doc. 60, at 43). In support, the plaintiffs cite *Moeck v. Pleasant Valley School District*, where the court denied a motion to dismiss on the basis that there remained "a question … as to whether the defendants violated

a constitutional right." *Moeck v. Pleasant Valley Sch. Dist.*, 983 F. Supp. 2d 516, 529 (M.D. Pa. 2013). But no question exists in this action; the plaintiffs have failed to adequately establish a violation of a constitutional right.

The plaintiffs have failed to identify a controlling case or a robust consensus of cases that could be said to have clearly established the unconstitutionality of the defendants' conduct. *See Plumhoff v. Rickard*, 572 U.S. 765, 780 (holding that defendants were entitled to qualified immunity because the plaintiff failed to identify a controlling case or a robust consensus of cases that could be said to have clearly established the unconstitutionality of defendants' conduct); *Lane v. Franks*, 573 U.S. 228, 246 (2014) (holding that because the constitutional question at issue "was not 'beyond debate'" when the defendant acted, he was entitled to qualified immunity). Our review of prior precedent reveals no cases where a state-created danger was established after a student-athlete was required to participate in softball drills, particularly soft toss, which is the level of specificity that both controlling case law and a robust consensus of cases requires us to apply in this analysis. *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 640 (3d Cir. 2015) ("The case

law simply did not inform a reasonable gym teacher that the failure to assess a student who briefly goes under water for the possibility of dry drowning violated the student's constitutional right to bodily integrity free from unwarranted intrusions by the state."); *see also Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 174 (3d Cir. 2017) ("[I]n November of 2011 it was not so plainly obvious that requiring a student-athlete, fully clothed in protective gear, to continue to participate in practice after sustaining a violent hit and exhibiting concussion symptoms implicated the student athlete's constitutional rights."); *Hinterberger v. Iroquis Sch. Dist.*, 548 F. App'x 50, 54 (3d Cir. 2013) ("[I]t was not 'beyond debate' as of March 2004 that [a parent-volunteer coach]'s decision to introduce a new cheerleading stunt following a delay of several months, through the instruction of an experienced cheerleader, with the use of multiple spotters, but without any matting, violate [the student-athlete]'s substantive due process rights."). Indeed, as we noted above in the most analogous case to this current action, the Third Circuit found no constitutional violations for a defendant's failure to ensure safety equipment during softball practice after the plaintiff was hit in the mouth by a softball without a protective screen. *See Lesher*, 822 F. App'x

at 121. As the Circuit has articulated, "there is no robust consensus of persuasive authority recognizing a 'right to be free from playing dangerous sports without protected equipment where injury is foreseeable.'" *Cuvo on behalf of A.C. v. Pocono Mountain Sch. Dist.*, No. 22-1576, 2023 WL 4994527, at *4 (3d Cir. Aug. 4, 2023). Therefore, it can hardly be said that there is a constitutionally established right to be free from playing dangerous sports *with* protected equipment. *See* (Doc. 57-5, ¶ 40) (finding that A.M. pitched behind a pitching screen without any holes or discernable flaws); (Doc. 57-5, ¶ 40) (indicating that that A.M. pitched with a helmet). For these reasons, based upon the record, we find that the individual defendants are entitled to qualified immunity with respect to the plaintiffs' § 1983 state-created danger claims. We will grant the defendants' motions for summary judgment as to the plaintiffs' claims against the individual defendants.

## IV.    Conclusion

For the foregoing reasons, we will grant the defendants' motions for summary judgment.

An appropriate order follows.

Dated: September __16__, 2025

JOSEPH F. SAPORITO, JR.
United States District Judge